1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

**TYRONE ROGERS,
CDC #V-35389,**

                                                **Plaintiff,**

                        **vs.**

**G. J. GIURBINO; D. URIBE;
P. KUZIL-RUAN; B. NARVIS,**

                                                **Defendants.**

Civil No.        11cv0560 IEG (RBB)

**ORDER**

**(1) GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT; AND**

**(2)  DENYING PLAINTIFF'S EX PARTE
APPLICATION**

**[ECF Nos. 74, 92]**

        Plaintiff Tyrone Rogers ("Rogers"), a state prisoner incarcerated at Centinela State Prison ("CEN"), is proceeding pro se and in forma pauperis with a Second Amended Complaint ("SAC") in his  42 U.S.C. § 1983 civil rights action filed nearly two years ago.  He alleged under several legal theories, that his religious exercise was infringed during certain prison lockdowns over an approximate fourteen month period.  Only one of his original claims and one named defendant have survived dismissal in prior proceedings.  The remaining claim alleges the suspensions of religious group assembly during the prison lockdowns violated Rogers' rights under the  Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C.A. §§ 2000cc et seq.  This matter is now before the Court on remaining defendant Facility B Captain P. Kuzil-Ruan's Fed.R.Civ.P. 56 Motion For Summary Judgment ("Motion") on that claim.  In consideration of the evidence presented and controlling legal authority, for the reasons discussed below, the Motion is **GRANTED**.

1    I.    **BACKGROUND**

2        Rogers' claim arises from three prison lockdowns at CEN for weapons searches in May, June,

3    and August 2010, each lasting about ten days, and a series of "rolling lockdowns" between March 2010

4    and June 2011, each lasting one day at two- to four-day intervals.  Defendants  describe the rolling

5    lockdowns as "intermittent modification to the normal programming" mandated by "a Three-to-Five

6    Percent Staff Redirection Plan prepared by CDCR."  (ECF No. 74-1 at 10.)[1]  During the lockdowns,

7    Rogers was prevented from assembling with other Protestants for fellowship, group prayer services, and

8    ministry classes.  (SAC 4-5, ECF No. 8)[2]  The Court dismissed defendant B. Narvis before service of

9    the SAC, along with Rogers' Eighth Amendment and access to courts claims.  (ECF No. 9.)  By Order

10   entered February 14, 2012, the Court granted in part and denied in part defendants' Motion To Dismiss

11   the SAC for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), dismissing defendants G. J.

12   Giurbino and D. Uribe and disposing of his First and Fourteenth Amendment claims, leaving only his

13   RLUIPA claim against defendant B-Yard Facility Captain P. Kuzil-Ruan ("Kuzil-Ruan").  (ECF No.

14   33.)  Kuzil-Ruan then filed her Answer.  (ECF No. 34).

15       Kuzil-Ruan now moves for summary judgment on the RLUIPA claim pursuant to Fed.R.Civ.P.

16   ("Rule") 56 ("Motion").  (ECF No. 74.)  She contends:  "(1) The undisputed facts show that there was

17   not a substantial burden on Plaintiff's exercise of religion as alleged in Plaintiff's Second Amended

18   Complaint and Defendant therefore did not violate [the RLUIPA]; (2) The undisputed facts show that

19   Defendant and her successors had a compelling government interest in undertaking the actions alleged

20   in the Second Amended Complaint and undertook those actions by the least restrictive means after

21   considering options and therefore did not violate RLUIPA; (3) The undisputed facts show that Plaintiff

22   is not entitled to damages as a matter of law under RLUIPA."  (ECF No. 74 at 2.)  Rogers filed an

23   Opposition  (ECF No. 81), and Kuzil-Ruan filed a Reply (ECF No. 88).

---

24       [1]  Kuzil-Ruan represents that, "[d]uring discovery," Rogers expanded the scope of his claim "to include
25   the intermittent modified programming as well as his three ten-day lockdowns, calling them 'rolling lockdowns.' "
     (ECF No. 74-1 at 10 n.2:  "Because of the liberality permitted with amendments as well as the lack of prejudice
26   to Defendant, Defendant addresses the 'rolling lockdowns' " as part of the SAC. Actually, Rogers' SAC expressly
     challenges both categories of lockdown as RLUIPA violations. (*See, e.g.*, SAC at 1, 5, 7, 12-13.)

27       [2]  Page numbers for docketed materials cited in this Order refer to those imprinted by the Court's
28   electronic case filing system.

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  The Civil Rights Act

The Civil Rights Act, 42 U.S.C. § 1983 ("Section 1983") created a procedure for the vindication of federal rights, providing "the vehicle whereby plaintiffs can challenge actions by governmental officials." Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002); Graham v. Connor, 490 U.S. 386, 393-94 (1989) ("[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred' ") (citation omitted).  "To prove a case under section 1983, the plaintiff must demonstrate that (1) the action occurred 'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal statutory right." Jones, 297 F.3d at 934 (citations omitted).  There is no dispute that Kuzil-Ruan, a prison official participating in the implementation of lockdowns that suspended institutional programming including communal religious exercise in which Rogers participated, was acting under color of state law.  He states his remaining claim arising from those interruptions as violations of rights conferred by the federal RLUIPA statute.

#### 2.  Summary Judgment

Any party "may move, with or without supporting affidavits, for summary judgment on all or part of [a] claim." Rule 56(a), (b).  Summary judgment is properly entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).  The materiality of facts is determined by looking to the substantive law defining the elements of the claim. See Anderson, 477 U.S. at 248.

The moving party is not required to produce evidence negating the non-movant's claims but does bear the "burden of showing the absence of a genuine issue as to any material fact. . . ." Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); see Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986) (the court considers all the evidence in the light most favorable to the non-moving party and accepts the version of disputed facts most favorable to that party in deciding whether there is a genuine issue for

trial).  If the moving party fails to discharge its initial burden to show "the absence of a genuine issue concerning a material fact," summary judgment must be denied, and the court need not consider the non-moving party's evidence.  <u>Adickes</u>, 398 U.S. at 159-60.

If the movant carries its burden, the burden then shifts to the non-moving party to establish facts beyond the pleadings that show there remains a disputed issue of material fact so that summary judgment is not appropriate. The opposing party may not rest on conclusory allegations or mere assertions.  *See* <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, it must identify specific facts showing there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250.  The non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Celotex</u>, 477 U.S. at 324, *quoting* Rule 56(e); *see* <u>Adickes</u>, 398 U.S. at 157.  "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." <u>Arpin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 919 (9th Cir. 2001) (internal punctuation and citation omitted).

When the Court considers evidence from both sides, "[i]f reasonable minds could differ as to the import of the evidence" and there is "evidence on which the jury could reasonably find for either party," summary judgment for the moving party must be denied.  <u>Anderson</u>, 477 U.S. at 250-51, 254. Conversely, summary judgment must be entered in favor of the moving party "if, under the governing law, there can be but one reasonable conclusion as to the verdict." <u>Id.</u> at 250-251; <u>Celotex</u>, 477 U.S. at 325.  In deciding the motion, a district court does not make credibility determinations, weigh conflicting evidence, or draw inferences, as those are functions reserved for the trier of fact. <u>Anderson</u>, 477 U.S. at 249, 255, 249; *see* <u>Lujan v. Nat'l Wildlife Federation</u>, 497 U.S. 871, 888 (1990) ("In ruling upon a Rule 56 motion, 'a District Court must resolve any factual issues of controversy in favor of the non-moving party' only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied").

\\

\\

**B.    Rogers Was Advised Of The Motion's Potential Consequences And Of His Opposition Obligations**

Among her Motion papers served and filed on November 13, 2012, Kuzil-Ruan provided Rogers with a "Warning To Plaintiff Regarding Opposing Summary Judgment" that conforms to the requirements of Rand v. Rowland, 154 F.3d 952, 962-63 (9th Cir. 1998) (en banc).  (ECF No. 74-2.)  The Rand court applied the rule from Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988) establishing notice as a substantial right to require that pro se prisoners pursuing relief under 42 U.S.C. § 1983 must be advised of the rules codified at Rule 56 and of the consequence that the case will be dismissed without a trial if the defendant's summary judgment motion is granted.  In particular, Rogers received notice of his obligation to produce evidence to create a triable material fact in order to avoid that consequence.  In addition, this Court reiterated the Rand notice to Rogers in its November 15, 2012 Order continuing the December 17, 2012 Motion hearing date to January 22, 2013.  (ECF No. 75.)

Despite those notices, Rogers' Opposition is deficient.  He produces no evidence as defined by Rule 56 in support of his Opposition.  Rather than substantiate a material issue of fact "that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth," Seaboard Corp., 677 F.2d at 1306, he continues to rely on vague allusions to unspecified "genuine facts" and purported evidence from unidentified individuals or other sources he suggests he could develop if only discovery were reopened.  (*See* ECF No. 81 at 2, 4, 9,10.)  His supporting "Declaration" consists solely of his attestation that his conclusory arguments are "true and correct to the best of [his] knowledge," that "if called [he] would testify to the same." (ECF No. 81 at 10-11.)  Exhibit A to his Opposition consists of two pages from the Department of Corrections and Rehabilitation Operations Manual addressing incident reporting procedures.  (Id. at 12.)  Exhibit B consists of a Memorandum directed to "Associate Directors, Division of Adult Institutions" and "Wardens" dated February 2, 2010, setting out the "3 and 5 Percent Redirection Plans" to address reduced institutional staffing issues, a Memorandum dated August 10, 2010 on the subject of the "Three Percent Position Reduction Assessment" (Id. at 14-15), and a Director's Level Appeal Decision denying Rogers relief from his challenge to the "rolling" lockdown periods on grounds, among others, that they "are not allowing for religious attendance." (Id. at 16-17.)  Exhibit C is a May 23, 2011 Fact Sheet summarizing the United

States Supreme Court's ruling affirming that California must comply with an order to reduce its prison population.  (Id. at 18.)

Rogers has had ample opportunity to develop the factual and evidentiary bases for his RLUIPA claim.  He initiated this action on March 21, 2011 and filed the operative pleading, his SAC, on July 12, 2011.  (ECF No. 8).  Nevertheless, along with his Opposition (ECF No. 81), he filed an "Ex Parte Motion To Stay Summary Judgment Until Plaintiff Can Obtain Discovery Necessary To Oppose" (ECF No. 82), followed on December 20, 2012 by a motion seeking to add additional defendants (ECF No. 85) and a "Second Request"for production of documents (ECF No. 86), both purportedly to enable him to oppose the Motion.  By Order entered December 21, 2012, this Court denied those requests, noting that the time for such motions had passed under the April 11, 2012 Scheduling Order governing the case (ECF No. 47), and that Rogers had not attempted the good cause showing required to reopen discovery or to amend pleadings beyond those deadlines.  (ECF No. 87.)  The Court further observed it had already dismissed the defendants Rogers proposed to add and had "repeatedly denied Plaintiff's attempts to add these same defendants and related claims."  (Id. at 1-2.)  On January 25, 2013, the Court denied yet another of his ex parte motions to reopen discovery or to amend the pleadings (ECF No. 90), noting that the motion was simply "the latest in a long line of repetitive requests to reopen discovery or amend the pleadings . . . ."  (ECF No. 91 at 1.)  The Court reminded him that under the Scheduling Order, "discovery closed October 15, 2012, and the deadline for motions to join parties or otherwise amend the pleadings passed July 16, 2012."  (Id.)

Despite the Opposition deficiencies, in deciding this Motion, the Court has considered all the evidence properly before it in the light most favorable to Rogers.  Anderson, 477 U.S. at 255; Celotex, 477 U.S. at 324.  That evidence includes excerpts from Rogers' October 12, 2012 Deposition that Kuzil-Ruan provides in support of her Motion as Exhibit A to the Findley Declaration, ECF No. 74-7.

**C.**   **Rogers Fails To Identify A Triable Issue Of Material Fact On His  RLUIPA Claim, And Defendant Is Entitled To Judgment As A Matter Of Law**

**1.**   **The RLUIPA**

Congress passed the RLUIPA "to 'protect[] institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and

accommodation for exercise of their religion.' " Khatib v. County of Orange, 639 F.3d 898, 900 (9th Cir. 2011), *quoting* Cutter v. Wilkinson, 544 U.S. 709, 721 (2005). The enactment creates a statutory basis for "protect[ing] prisoners and other institutionalized people from government infringement on their practice of religion." Mayweathers v. Newland, 314 F.3d 1062, 1065 (9th Cir. 2002); *see* Cutter, 544 U.S. at 715. Section 3 of the RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined in an institution . . . , even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a).

By codifying a "compelling governmental interest" standard, the RLUIPA extends federal statutory protection to prisoners' religious exercise beyond the protections embodied in the federal Constitution. Under traditional First Amendment jurisprudence, a prisoner's free exercise claims are analyzed under the deferential "rational basis" standard of Turner v. Safley, 482 U.S. 78 (1987). *See* Beard v. Banks, 548 U.S. 521, 528-30 (2006) (courts analyze the competing interests of necessary prison regulations and First Amendment rights by finding a regulation valid if it is " 'reasonably related' to legitimate penological interests"), *quoting* Turner, 482 U.S. at 87. In contrast, the RLUIPA "requires the government to meet a higher burden of proof than the rational basis standard of Turner." Pierce v. County of Orange, 526 F.3d 1190, 1209 n.19 (9th Cir. 2008), *citing* Greene v. Solano County Jail, 513 F.3d 982 (9th Cir. 2008). To satisfy the statute, the government must show "that the burden it imposes on religious exercise is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." Greene, 513 F.3d at 986 (internal quotations omitted), *citing* Cutter, 544 U.S. at 717.

Nevertheless, "[w]hile [the RLUIPA] adopts a 'compelling government interest' standard, '[c]ontext matters' in the application of that standard." Cutter, 544 U.S. at 722-23 (citation omitted). "We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety"; rather, "[o]ur decisions indicate that an accommodation must be measured so that it does not override other significant interests." Id. at 722. Courts are expected to apply the standard with "due deference to the experience and expertise of prison and jail administrators in

establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  Id. at 723 (internal punctuation and citation omitted).

"[T]he plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b).  The RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); see also Cutter, 544 U.S. at 715.  The statute expressly instructs it "shall be construed in favor of broad protection of religious exercise."  42 U.S.C. § 2000cc-3(g).  Once the plaintiff identifies "the 'religious exercise' allegedly impinged upon," courts "ask whether the prison regulation at issue 'substantially burdens' that religious exercise" in consideration of the plaintiff's showing. Greene, 513 F.3d at 987; see Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005) (To be found a "substantial burden" on "religious exercise", the action "must impose a significantly great restriction or onus upon such exercise") (citation omitted); Shakur v. Schriro, 514 F.3d 878, 888 (9th Cir. 2008). If the plaintiff makes that showing, to avoid liability the defendant must demonstrate that the imposed burden "furthers a compelling governmental interest, and does so by the least restrictive means." Greene, 513 F.3d at 988 (internal punctuation and citations omitted); 42 U.S.C.A. § 2000cc-1(a).

### 2.    Substantial Burden On Religious Exercise

Rogers argues the restrictions on his ability "to assemble with fellow Protestants during the lockdown periods" to "liv[e] our Protestant faith" substantially burdened his right to freely exercise his religion in violation of the RLUIPA.  (SAC at 4.)  Group worship is an example of religious exercise. See Cutter, 544 U.S. at 720.  "We have little difficulty concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise."  Greene, 513 F.3d at 988.  In this Court's Order dismissing all but Rogers' RLUIPA claim, the Court found he stated a prima facie RLUIPA claim by pleading sufficient facts "to show that the May, June and August 2010 lockdowns 'substantially burdened' his ability to exercise his religion, and specifically his ability to 'liv[e] out his Protestant faith' by restricting his ability to 'attend weekend (Sat. & Sun.) Protestant fellowship, Sunday morning prayer service, and Saturday morning Bible study classes" during those times "in violation of

RLUIPA." (ECF No. 33 at 12-13.)  Kuzil-Ruan  appears to concede the three ten-day lockdown periods

Rogers challenges "substantially burdened" that aspect of his religious exercise.

Concerning the "rolling lockdowns", Kuzil-Ruan describes them as "one-day lockdowns implemented to spread staff shortages across an institution to prevent either irregular lockdowns or one yard from being locked down for a significant period of time," a practice that "lasted from March, 2010 through June, 2011" due to the three and five percent staff reduction plans.  (ECF No. 88 at 3; Kuzil-Ruan Decl. ¶ 14.)  Those lockdowns "were typically every fourth day, but never occurred two days in a row." (ECF No. 88 at 3; Kuzil-Ruan Decl. ¶ 15.)  Rogers acknowledges the rolling lockdowns never occurred more than one day in  a row.  (Findley Decl. Exh. A, Rogers Depo., ECF No. 74-7 at 56-57: "Q:  . . . [O]ther than the three ten-day lockdowns . . . , you'd have one day rolling lockdown and the next day it would be normal programming?   A:  Correct.")  In characterizing their effect on Rogers' religious exercise, Kuzil-Ruan argues "[t]he rolling lockdowns were therefore, at most, a temporary and intermittent ban on group worship . . . not a substantial burden on Plaintiff's exercise of his religion." (ECF No. 88 at 3-4, citing Lewis v. Ollison, 571 F.Supp.2d 1162, 1170-71 (C.D.Cal. 2008), dismissing on a Rule 12(b)(6) motion a RLUIPA claim challenging a prison policy requiring that inmates escorted to the showers be dressed in boxers and shower shoes rather than in more modest clothing preferred by Islamic inmates, implemented during temporary periods of heightened security to avoid weapons concealment, because the policy did not significantly interfere with their religious exercise and was in furtherance of a legitimate penological interest.)

Although Rogers fails to produce evidence to refute Kuzil-Ruan's characterization of the effect of the rolling lockdowns on his religious exercise, her description appears to acknowledge that group worship was banned sometimes, presumably when the lockdown day fell on a Saturday or a Sunday or other normal-programming religious fellowship days, as almost certainly occurred over the course of the many months the policy was in place.  Therefore, construing the evidence in the light most favorable to Rogers, as the non-moving party, Anderson, 477 U.S. at 255, the Court assumes solely for the purpose of deciding this Motion that the total ban on group religious exercise on those days imposed a substantial burden on Rogers' religious exercise.  Greene, 513 F.3d at 988.

\\

### 3. **Compelling Government Interest**

Rogers alleges the defendants violated his RLUIPA rights "by the implementation and administering the [sic] wanton 3% to 5% Redirection Plan, plus the allowance of the unnecessary three ten day lockdowns occurring between March 2010 through June 2011." (SAC at 8.)   He characterizes the Plan as an "unconstitutional policy" that caused both the use of "unnecessary rolling lockdowns" as well as the three ten-day lockdown periods.  (SAC at 2-5.)  He alleges the institution "self-created" the lockdowns and therefore cannot show that a "compelling government interest" motivated them.  (SAC at 9:  "[T]he Supreme Court declares California's ideology and methodology created their own budget problems," both of which constitute "systemic administrative failures which cause the overcrowding").  He summarily argues "Defendants do not deserve summary judgment to suspend Plaintiff's Protestant group worship, group prayer, and group studies." (ECF No. 81 at 4: "Plaintiff alleges that Defendants['] ideology and metho[do]logy does not warrant summary judgment" and "Defendants did not use the least restrictive means to deny Plaintiff's RLUIPA faith services.")

In addition,  Rogers infers that the weapons search reasons for the three ten-day lockdowns were pretextual justifications.

> The B-Yard Facility under the direction of acting Captain P. Kuzil-Ruan violated Plaintiff['s] and other inmates' RLUIPA . . . civil rights to normal religious service . . . when on three distinct occasions frivolously ended inmates['] normal program when: (1) On May 18 thru May 28, 2010, a wanton State of Emergency (CCR 3383) lockdown developed behind the B-Yard Medical Staff (MTA) knowingly released scissors to the C-Yard MTA; (2) On June 12 thru June 22, 2010, a wanton CCR-3383 lockdown behind Correction Officer Byfield (Build-1) lost a single bullet enclosed within a highly secure space, free of inmate connection; and (3) On August 13 thru August 24, 2010, another wanton CCR 3383 lockdown developed behind a supposed missing dental tool.

(SAC at 3-4 (exhibit reference omitted).

In particular, regarding the May 2010 lockdown, Rogers testified at his October 2, 2012 deposition he believes that no scissors were missing and that the "true reason" for the May lockdown was that a correctional officer propositioned "a female free staff", she refused, and the correctional staff consequently instituted a lockdown.  (Findley Decl. Exh. A, ECF No. 74-7 at 40-42.)  Regarding the June 2010 lockdown, he acknowledged it "occurred because of the loss of a single bullet in the tower," but infers no lockdown was necessary because the tower "is located within Building 1 in a secure – inmate-free, highly secure place."  (Id. at 42.)  When asked whether he believes there was a different

11cv0560IEG(RBB)

reason for that lockdown, he replied:  "I have no idea what the reason for that was. . . .  I'm just suspicious with that lockdown as I am with the lockdown that occurred . . . in May."  (Id. at 43, 47-49.) Regarding the August 2010 lockdown, he contended, "There has not been one shred of evidence that the dental tool was ever missing" and he believed that lockdown was "just another way of helping out the . . . budget problem that the CDCR was under," to "save costs," but acknowledged he was unaware of any evidence to support that argument.  (Id. at 44-45.)   Rogers' mistrust of the official explanations for the three ten-day lockdown periods does not qualify as evidence adequate to defeat a properly supported summary judgment motion.  Rule 56; Anderson, 477 U.S. at 249-50, 256; Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157; see also Arpin, 261 F.3d at 919.  He similarly argues:

> Defendants admit that the rolling lockdowns are design due to reduce [sic] cost saving, overtime pay, reduction of cost, and vacant positions, in-which hampers [sic] Plaintiff's RLUIPA rights to group worship, group pray, and group study, then Plaintiff has stated a[] RLUIPA claim.  42 U.S.C. §2000cc-1(a) & 42 U.S.C. §1997 [sic].

(ECF No. 81 at 9.)

However, at the summary judgment stage, Rogers was required to do more than merely "state a claim."  In support of her Motion, Kuzil-Ruan submits the explanatory Declarations of four Facility B Captains during the relevant time periods, including her own.

> The lockdown from May 18, 2010 through May 28, 2010 was required by the loss of a pair of scissors on Facility B.  On May 16, 2010, the medical staff reported to the Facility B Lieutenant that a pair of scissors was missing from the Facility B Medical clinid.  (Kuzil-Ruan Decl. ¶ 7.)  The Lieutenant reported it to Captain Kuzil-Ruan.  (Id.) Scissors can be used as a weapon.  In the past, inmates have used scissors to stab other inmates or correctional staff.  (Id.)  As a result, the missing scissors presented a security threat to the institution.  (Id.)

> The lockdown from June 12 through 22, 2010 was required by the loss of .223 caliber ammunition round on Facility B.  (Maldonado Decl. ¶ 6.)  By June 12, 2010, Captain Kuzil-Ruan had left Centinela State Prison and M. Maldonado was Acting Captain of Facility B.  (Kuzil-Ruan Decl. ¶ 4; Maldonado Decl. ¶¶ 2-3.)  On June 12, 2010, Captain Maldonado was notified that a .223 caliber ammunition round was missing from Building One on Facility B.  (Maldonado Decl. ¶ 6.)  Captain Maldonado was concerned because an ammunition round contains gunpowder and can be used to manufacture a zip-gun or other explosive device for use as a weapon by inmates.  (Id.) As a result, the missing ammunition round presented a security threat to the facility. (Id.)

> The lockdown from August 17 through August 24, 2010 was required by a missing dental tool.  ([Sais Decl.] ¶ 6.)  At the time of the third lockdown, J. Sais was the Acting Captain of Facility B.  (Id.)  The dental tool was described as a dental spatula, but was actually a six-inch stainless steel rod.  (Id.)  Such metal tools can be sharpened and are frequently used by inmates as a weapon.  (Id.)  As a result, the dental tool

1      presented a security threat to the institution.   (*Id.*)

2          As a result of the missing scissors, bullet, and dental tool, the Facility Captain
3      determined that it was necessary to perform a methodical search of every cell and every
       inmate on Facility B.  (Kuzil-Ruan Decl. ¶ 10; Maldonado Decl. ¶ 8; Sais Decl. ¶ 7.)

4      (ECF No. 74-11 at 8-9.)

5          Those declarations substantiate that the May, June, and August 2010 lockdowns were

6      implemented to allow a systematic search for particular potential weapons. The maintenance of prison

7      security is not only a legitimate, but a "compelling governmental interest." <u>Greene</u>, 513 F.3d at 988

8      (finding a compelling government interest justified prison officials' total ban on group worship by high-

9      security inmates for the purpose of ensuring prison security), *citing* <u>Cutter</u>, 544 U.S. at 725 n.13.  That

10     showing shifted the burden to Rogers to create a triable issue based on affirmative evidence beyond the

11     pleadings that no compelling reason existed.  <u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.

12         Rogers alludes in his opposition to "Interrogatory No. 8" as purportedly substantiating that

13     "Defendants caused their own problems by overcrowding the prison system" so that "their own systemic

14     problems then deprived Plaintiff of his RLUIPA rights" (ECF No. 81 at 7), but he does not produce any

15     interrogatories.  Moreover, that argument does not address Kuzil-Ruan's demonstration of compelling

16     need for the particular lockdowns.   Rogers acknowledges that personnel reductions at CEN affected

17     the deployment of correctional staff to implement normal programing at the challenged times,

18     irrespective of the causes of the reduced staffing.   He infers that staffing reductions affecting the

19     availability of security coverage for inmate movements  and group assemblies cannot create a

20     compelling government interest adequate to warrant suspension of group religious exercise when the

21     staff shortage is purportedly the result of institutionally self-inflicted prison overcrowding.   (*See*

22     Findley Decl. Exh. A, ECF No. 74-7 at 35-47; ECF No. 81 at 9, arguing "no legitimate government

23     purpose for the lockdowns exist[s] when overcrowding created Defendants['] problems"; *see* SAC at 6-

24     7: defendants' "administrative failure" caused  them to use "a relativism approach to impact their view

25     of the 3% to 5% Redirection Plan" to create the rolling lockdowns "in-order to deceive the Court," after

26     having "caused their own problems by overcrowding the prison system.")  However, the RLUIPA does

27     not "elevate accommodation of religious observances over an institution's need to maintain order and

28     safety." <u>Cutter</u>, 544 U.S. at 722-23, 725 n.13; <u>Greene</u>, 513 F.3d at 988.  A lack of resources to

adequately monitor and manage inmate group movements and assemblies indisputably raises institutional safety and security concerns.

Rogers creates no genuine issue of material fact when he simply expresses his hope that "after discovery is granted to Plaintiff" -- an option now entirely foreclosed in this case -- that "[t]his Court will determine if Defendants have a compelling government interest . . ." (ECF No. 81 at 9, *citing* Harris v. Pate, 440 F.2d 315, 318 (1971), a distinguishable prisoner civil rights case finding abuse of discretion in the trial court's refusal to grant plaintiff a continuance to obtain affidavits to support an opposition to defendant's dispositive motion, filed less than two months after the complaint.) Rogers represents in his Statement of Facts: "Discovery is required to show this Court the truth about Protestant services." (ECF No. 81 at 5.) That question and any answer to it are immaterial to the Motion resolution because the Court has already determined that confinement to in-cell religious observances during lockdown periods "substantially burdened" Rogers' participation in Saturday and Sunday group worship services within the meaning of the RLUIPA.   (ECF No. 33 at 13.) The dispositive Motion questions are instead whether triable issues of fact exist that the suspensions of group religious assembly were in furtherance of a compelling institutional need served by the least restrictive means.  As Kuzil-Ruan observes:

> Plaintiff argues that the lockdowns were instituted for various improper purposes. (Opp'n at 6.) Plaintiff does not submit any evidence to support his position, but requests the Court to re-open discovery to allow him to attempt to uncover evidence of Defendant's nefarious purposes in ordering the lockdowns. (*Id.*) The Court has denied Plaintiff's motion to re-open discovery. (ECF No. 87.) Plaintiff has not submitted any evidence to rebut Defendant's undisputed evidence that there were compelling government interests in ordering each of the three ten-day lockdowns.  Defendant is therefore entitled to summary judgment.

(ECF No. 88 at 6.).

The Court finds that Kuzil-Ruan carries her burden to advance undisputed facts that show suspension of  group worship during the weapons searches and the rolling lockdown periods, when insufficient staff was available both to ensure the safety and security of the facility and to provide the necessary inmate monitoring required for group religious exercise, furthered a compelling government interest.   Rogers fails to rebut that showing with any countervailing evidence.

### 4.    Least Restrictive Means

"[I]n light of RLUIPA, no longer can [defendants] justify restrictions on religious exercise by simply citing the need to maintain order and security in a prison." Greene, 513 F.3d at 988-89.  While "prison security is a compelling state interest, and . . . deference is due to institutional officials' expertise in this area," Cutter, 544 U.S. at 725 n.13, more is required to avoid RLUIPA liability.  Officials must show that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." Warsoldier, 418 F.3d at 999.  "If prison officials meet th[is] standard, the prison regulation passes muster under RLUIPA, regardless of the burden it imposes on religious exercise." Greene, 513 F.3d 990.

In support of her demonstration that confining religious exercise to in-cell during the lockdowns at issue was selected as the least restrictive means, Kuzil-Ruan describes the manpower requirements to control inmate movements and group assembly during normal religious programming:

> During normal programming on Facility B, group worship services for all religions typically takes place in the chapel. (Kuzil-Ruan Decl. ¶ 5.)  The chapel for Facility B is located within the Facility, but is separate from the housing units.  (Id.)  It is the same building as the canteen, law library, and the programming office, where the Facility Captain, Lieutenant, and Sergeant all have their offices. ([Maldonado Decl.] ¶ 4.)  To access the chapel, an inmate must leave his housing unit, cross the yard, and enter the chapel. (Kuzil-Ruan Decl. ¶ 5.)  There are risks associated with allowing inmates to be on the yard and to congregate in the chapel. (Id.)  Inmates are able to barter goods and services, pass weapons, and communicate gang orders while in the chapel. (Id.)  Also, any time there are inmates congregated in one area, there is a possibility of inmate-on-inmate violence, to which correctional officers must be able to respond. (Id.)

> To attend a particular chapel service, the chaplain, with the assistance of inmate clerks, must place an inmate's name on a list. (Id. at ¶ 6.)  The list is then delivered to the Inmate Assignment Officer to be included in the Daily Movement Sheet for all inmates. (Id.)  The Daily Movement Sheet is then distributed to prison staff. (Id.)  If an inmate has no restrictions that prevent him from attending chapel, he is permitted to attend. (Id.)  At the time appointed for a particular service, inmates on the Daily Movement Sheet for that service are released from their cells and walk over to the chapel. (Id.)  At least two correctional officers are on the yard at all times and one officer will process the inmates I and out of the chapel. (Id.)  The officers will do periodic checks in the chapel to insure the safety of the inmates and the free staff volunteers working in the chapel. (Id.)

(ECF No. 74-1 at 7-8.)

Kuzil-Ruan explains the rationale and choices officials made regarding group services during the weapons searches:

> There are five buildings on the [Facility B] yard. (Kuzil-Ruan Decl. ¶ 10; Maldonado Decl. ¶ 8; Sais Decl. ¶ 7.)  Also, at that time, inmates were being housed in the gym. (Id.)  Prison staff went through every cell in every building, and searched each inmate.

(*Id.*) Prison staff also searched the chapel, law library, and program office. (*Id.*)

During each lockdown, the Facility Captain considered whether group worship was possible. (Kuzil-Ruan Decl. ¶ 10; Maldonado Decl. ¶ 8; Sais Decl. ¶ 8.) Each Facility Captain filled out a document entitled "Program Status Report – Plan of Operation." (*Id.*) In doing so, each Facility Captain determined that recreation, canteen and phone calls would need to be suspended during the search. (*Id.*) Each Facility Captain also specifically considered allowing group religious services, before determining such services were not feasible for two reasons. (*Id.*)

First, all available correctional staff was engaged in the search for the potential weapon. (Kuzil-Ruan Decl. ¶ 11; Maldonado Decl. ¶ 9; Sais Decl. ¶ 9.) None of the correctional staff were available to be on the yard or outside the chapel to supervise services. (*Id.*) They would therefore not be able to respond to any inmate crimes, such as theft or violence among inmates. To pull officers away from the search would have extended the lockdown, and would have extended the suspension of services such as normal legal library access and non-critical medical appointments. (*Id.*)

Second, allowing inmates from different buildings within Facility B, or even from different cells within the same building, to congregate at the chapel would contaminate the search. (Kuzil-Ruan Decl. ¶ 12; Maldonado Decl. ¶ 10; Sais Decl. ¶ 10.) If inmates from a cell that had not been searched, were allowed to comingle with inmates from a cell that had been searched, the inmates not yet subject to search could pass the weapon to the inmates how had already been searched. (*Id.*) After making this determination, each Facility Captain noted in his or her Program Status Report that religious services were modified to be "in-cell." (Kuzil-Ruan Decl. Ex. A; Maldonado Decl. Ex. A; Sais Decl. Ex. A.) Each Captain filled out the Program Status Reports throughout the lockdowns. (*Id.*)

(ECF No. 74-1 at 9-10.)

"Plaintiff concedes that if an inmate who is not on a list attends chapel there is a risk he will use the chapel as a way of committing crimes, including theft or a 'beatdown' of other inmates. (Rogers Dep. 49:25-50:15.)" (ECF No. 74-1 at 8.) Those undisputed facts substantiate that numerous correctional personnel are needed to safely implement the normal programming for group religious services. When a need arises to prioritize staff distribution in response to penological exigencies, such as the type of Facility-wide, labor intensive weapons searches that triggered the three ten-day lockdowns at issue, prison staff must necessarily be redirected to address the emergency. The search for potential weapons entailed inspection of every cell and every inmate and a lockdown to avoid search contamination through group contact such as for chapel purposes during that process. (Kuzil-Ruan Decl. ¶¶ 7, 9, 11-12; Maldonado Decl. ¶¶ 6-7, 9-10; Sais Decl. ¶¶ 6-7, 9-10.) The Declarations in support of the Motion substantiate that the availability of normal programming routines was unavoidably affected.

The daily Program Status Reports attached as Declaration exhibits substantiate that Kuzil-Ruan and her successor Captains considered the feasibility of permitting religious congregation programming to continue during the three ten-day lockdowns, as required under <u>Greene</u>, 513 F.3d at 988 and <u>Warsoldier</u>, 418 F.3d at 999.  She summarizes their reasons for suspending those group gatherings as the least restrictive means to achieve the necessary ends.

> All available correctional staff was engaged in the search for potential weapons.  (Kuzil-Ruan Decl. ¶ 11; Maldonado Decl. ¶ 9; Sais Decl. ¶ 9.)  There was not sufficient correctional staff available to be on the yard or outside the chapel to supervise services.  (*Id.*)  To pull officers away from the search would have extended the lockdown, and would have extended the suspension of services such as normal legal library access and non-critical medical appointments.  (*Id.*)  It also would have put the inmates congregating in the chapel at risk.  (*Id.*)  The inmates and free staff in the chapel could be the subject of inmate violence or other crimes to which correctional officers would not be able to respond.  (*Id.*)

> Additionally, allowing inmates from different buildings within Facility B, or even from different cells within the same building, to congregate in the chapel would contaminate the search.  (Kuzil-Ruan Decl. ¶ 12; Maldonado Decl. ¶ 10; Sais Decl. ¶ 10.)  The Captains considered that by allowing inmates from a cell that had not been searched to comingle with inmates from a cell that had been searched, the inmates not yet subject to search could pass the weapon to the inmates who had already been searched.  (*Id.*)

(ECF No. 74-1 at 19; *see* <u>id.</u> at 19-20; *see* Kuzil-Ruan Decl. Exh. A (missing scissors search), Maldonado Decl. Exh. A (missing ammunition search), Sais Decl. Exh. A (missing dental instrument).)

Kuzil-Ruan similarly substantiates the rationale and decision process for each rolling lockdown day when religious exercise was modified.  All but one of the Program Status Report form exhibits indicate religious exercise for each of the affected days was not entirely suspended, but rather was "modified" to be "in cell only."   "For each day of the rolling lockdowns, the Facility Captains considered and rejected group worship" for lack of sufficient staff to cover prisoner movements to and from chapel, and they recorded on the Program Status Sheets that religious activity that day would be "in-cell" only,  citing Kuzil-Ruan Decl. ¶16, Ex. B; Paul Decl. ¶ 5, Ex. A; and Sais Decl. ¶ 13, Ex. B.  (ECF No. 74-1 at 19-20; *see also* Maldonado Decl. Exh. B.)  "Having considered and rejected the efficacy of less restrictive means before adopting the challenged practice, Defendant and her successors met the standard under RLUIPA."  (<u>Id.</u> at 10, citing <u>Warsoldier</u>, 418 F.3d at 999, <u>Greene</u>, 513 at 990.)

Rogers disputes that the choice to restrict inmates to in-cell only religious exercise during the lockdowns was the least restrictive means, relying on the Program Status record exhibits submitted in

1  support of the Motion to contend:  "Plus, Defendants did not use the least restrictive means to deny

2  Plaintiff's RLUIPA faith services when other self help programs were allowed to meet, canteen

3  continued, packages were handed out, and visiting continued per Program Status Report."  (ECF No.

4  81 at 4, 7:  "Defendants allowed self help groups to convene, such as:  Wellness, KAIROS, AVP, and

5  issued packages, canteen, and visiting during rolling lockdowns," citing specific pages from the Motion

6  exhibits.)  He summarily argues that if those activities were permitted, then "Defendants did not use the

7  least restrictive means to suspend Plaintiff's Protestant faith."  (<u>Id.</u> at 10.)  In her Reply, Kuzil-Ruan

8  highlights the evidentiary deficiencies in Rogers' representations and suggests factual distinctions

9  between the permitted activities he identified compared to the demands on staff associated with group

10  worship gatherings that informed the Facility B Captains' decisions.  As she observes:

> Plaintiff does not submit any evidence that these groups posed a similar security risk during lockdowns.  Plaintiff does not submit evidence whether there groups met in the housing units or elsewhere.  Plaintiff does not submit evidence of the numbers of inmates who attend these sessions.  Absent such evidence, the fact that Plaintiff points to other programs that were allowed to continue for short periods of time does not rebut Defendant's evidence that she did not have adequate security to permit group worship.

(ECF No. 88 at 4-5.)

Kuzil-Ruan demonstrates that she is entitled to judgment as a matter of law in that both categories of lockdown "further[ed] a compelling governmental interest, and d[id] so by the least restrictive means," <u>Greene</u>, 513 F.3d at 988, and Rogers raises no triable issue of material fact in opposition to that showing.  As required under the RLUIPA, she substantiates both a compelling interest to maintain prison safety and security required suspension of group religious programming, and she shows the policy to restrict religious exercise to in-cell only during the lockdowns was adopted only after actual prior consideration and rejection of "the efficacy of less restrictive measures."  <u>Warsoldier</u>, 418 F.3d at 999; <i>see</i> <u>Greene</u>, 513 F.3d at 988-89; <u>Cutter</u>, 544 U.S. at 725 n.13.  It is not the province of the Court to second-guess operational requirements within prisons or to substitute its own assessment of staffing needs and staff allocations to ensure the safety and security of the institution, its staff, and the inmates.  <i>See</i> <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 407-08 (1989) (courts must give appropriate deference to prison officials because "the judiciary is 'ill-equipped' to deal with the difficult and delicate problems of prison management") (citation omitted); <u>Cutter</u>, 544 U.S. at 723 ("Lawmakers supporting

1   RLUIPA anticipated that courts would apply the Act's standard with 'due deference to the experience

2   and expertise of prison and jail administrators' ") (citation omitted).

3          Kuzil-Ruan's Rule 56 showing shifted the burden to Rogers to establish facts beyond the

4   pleadings that show there remains a triable issue of disputed material fact on his RLUIPA claim so that

5   summary judgment is not appropriate. Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157.  He falls far

6   short of that obligation when he summarily contends "Plaintiff has shown facts by [unspecified]

7   exhibits" that require summary judgment be denied on grounds "Defendants are not willing to provide

8   this Court and Plaintiff with key names of people involved in each three ten day lockdowns and

9   Defendants have given bad faith declarations to support their actions . . . ." (ECF No. 81 at 9.)  Without

10  making factual findings on the merits, the Court has considered all the evidence before it.  Rogers'

11  opposition arguments rely on conclusory allegations or mere speculation rather than probative evidence

12  on which a jury could reasonably rely to find in his favor.  Anderson, 477 U.S. at 249-50; Taylor, 880

13  F.2d at 1045.  His renewed calls for the Court to reopen discovery  create no genuine issue of material

14  fact for trial.  Accordingly, Kuzil-Ruan's Motion is **GRANTED**.

15          **D.     Availability Of Damages**

16          As an alternative argument to narrow the issues should the Court deny her Motion, Kuzil-Ruan

17  contends she is entitled to a summary adjudication that damages are not an available remedy under the

18  RLUIPA.  (ECF No. 74-1 at 20.)  Inasmuch as the Court finds she is entitled to summary judgment as

19  a matter of law on the RLUIPA claim for the reasons discussed above, it need not reach this issue.

20          **E.     Plaintiff's Ex Parte Application**

21          On January 25, 2013, about ten days after this Court issued its Order taking the fully-briefed

22  summary judgment motion under submission (ECF No. 89), Rogers filed an Ex Parte Application

23  seeking a "protective order for the court to distribute orders, notice, and judgments," citing Fed.R.Civ.P.

24  83.3(f).  (ECF No. 92.)  He declares that he did not receive the Court's November 15, 2012 Rand notice

25  and extension of time continuing the Motion hearing from December 17, 2012 to January 22, 2013 until

26  January 18, 2013 (ECF No. 75), when he received defendant's Reply to his Opposition.  He argues that

27  "Defendants or this Court's clerk have intentionally interfer[r]ed with Plaintiff's reception of this

28  Court[']s Nov. 15, 2012 Rand notice," and that he "filed, Dec. 7, 2012, Opposition without knowledge

1  of this Court's Rand Notice."  (ECF No. 92.)

2       However, not only does the docket memorialize that "All non-registered users [were] served via

3  U.S. Mail Service" with the November 15, 2012 Order (ECF No. 75), but also Rogers was provided with

4  proper Rand advisements along with Kuzil-Ruan's Motion papers served November 13, 2012 (ECF No.

5  74-2), removing any concern his purportedly belated receipt of the Court's redundant Rand notice in any

6  way prejudiced the preparation of his summary judgment opposition.  Moreover, the one month

7  continuance of the hearing date had no effect on his ability to marshal the evidence, as discovery closed

8  on October 15, 2012.  (ECF No. 47.)  Finally, any prospective instruction regarding the requirements

9  of Fed.R.Civ.P. 83.3(f) is unnecessary, as the resolution of this Motion disposes of all parties and all

10  claims in this action.  Accordingly, the Ex Part Application is **<u>DENIED</u>** as both without merit and moot.

11  **III.    CONCLUSION AND ORDER**

12      For all the foregoing reasons, **IT IS HEREBY ORDERED** Defendant's Motion For Summary

13  Judgment is **<u>GRANTED</u>**, disposing of all remaining claims and defendants in plaintiff's Second

14  Amended Complaint.  The Clerk of Court shall enter judgment in favor of defendants and dismiss this

15  action in its entirety, without leave to amend.

16      **IT IS SO ORDERED.**

17  DATED: February 26, 2013

18  _____
    **HON. IRMA E. GONZALEZ**
    United States District Judge